1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VASSAR SMITH,

        Petitioner,               No. C 03-4977 JSW

  v.

STUART RYAN,                **DENIAL OF PETITION FOR**
                                   **WRIT OF HABEAS CORPUS**

        Respondent.

_____/

### INTRODUCTION

Now before the Court is Petitioner Vassar Smith's petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 related to his 1999 convictions.  After considering the

administrative record, the parties' papers and arguments, and reviewing the relevant legal

authority, the court hereby DENIES the petition for writ of habeas corpus.

### BACKGROUND

Smith was convicted on eighteen counts of sexual abuse of a child and possession of

child pornography pursuant to California Penal Code § 288, 288.5, and 11.11.  The facts

underlying the charged offense as found by the Court of Appeal of the State of California, Sixth

Appellate District, are summarized below as follows:

> Defendant and his wife Susan met in the early 1960's when they were 12.  They next
> saw each other in 1981 at a wedding in Tennessee; at the time, Susan was divorced and
> struggling to provide for her nine- and eleven-year-old sons, C.W. and J.W. Defendant
> struck up a friendship with Susan and then contacted her from Palo Alto.  That
> Christmas, he proposed marriage, and Susan agreed. Before the wedding, defendant
> told Susan he had been counseled by a priest to tell her he had a "real fondness for

boys." Susan thought the confession odd but interpreted it to mean he would be a good father to her sons. The couple married in 1982, and Susan and her boys moved into the defendant's house in Palo Alto.

Susan and defendant did not have sexual relations before marriage. After the wedding, he said he wanted to start a family immediately, but his sexual behavior was "unusual" in that he wore his clothes and found aspects of sex "repugnant." Five months after the wedding, when defendant learned Susan was pregnant, he stopped having sex with her, became adamant the child had to be male, and insisted on an ultrasound to establish its gender. In 1983, he moved into a separate bedroom.

Defendant took an immediate interest in Susan's boys. He bought them new clothes, consisting of tight-fitting white shorts, and he visited their room at bedtime. In 1983, when her sons reported defendant was inappropriately fondling their buttocks under their underwear during "back rubs," Susan told defendant to stop. Susan testified defendant had little interest in A.S. early in life, had a markedly greater interest when A.S. was around five or six, and had much less interest after A.S. turned 13 or 14.

Defendant's son A.S., age 15 at the time of trial, testified as follows regarding defendant's behavior with him as a prepubescent boy.

Approximately three times a week from the time A.S. was six until 11 or 12, defendant engaged in night reading sessions with him in defendant's bedroom, with the door closed. Defendant lay on his back and read from books which centered around the lives of boys, while A.S. lay on his stomach, wearing pajamas or a white T-shirt and underwear. As he read, defendant would give A.S. a 10-minute "back rub," in which he repeatedly slipped his hand under A.S.'s underwear and fondled A.S.'s buttocks. A.S. estimated that, over the course of these sessions, defendant gave him a back/buttock rub on at least 400 occasions.

At about age nine, A.S. became uncomfortable with the buttock rubs and often declined defendant's offer of a "back rub." By age 10, A.S. frequently objected to the reading sessions. Defendant was adamant about continuing them and responded to the refusals by grounding A.S. or taking away his allowance.

While A.S. was between five and nine, defendant would wrestle with him and tickle him. He would hold A.S. down with one hand and, while V struggled to get away, he would pull down A.S.'s underwear and spank his bare buttocks. A.S. estimated defendant spanked his bare buttocks while wrestling around 200 times, often in the context of the reading sessions.

Defendant also often administered painful punishment spankings when A.S. was between five and 11. These often took place without justification; behind closed doors, defendant would have A.S. pull his pants down, and he would bend A.S. over his knee. A.S. eventually reported to his mother that defendant would spank him one cheek at a time, with each slap harder than the previous.

Defendant insisted A.S. wear white cotton briefs, even when A.S. decided he preferred boxer shorts. Defendant would scream at A.S. and threaten to burn any shorts in A.S.'s room. By age 12, A.S.'s relationship with his father changed; they fought more, and defendant no longer played with him. When A.S. was 13 or 14, defendant once angrily grabbed A.S. by the neck and choked him.

Defendant had a private office in a locked shed in the backyard; his second office was a converted bedroom where he kept his computer. When anyone walked by,

2

United States District Court

For the Northern District of California

1
2
3

defendant would turn off or block the screen.  When A.S. did see it, he noticed defendant using a program to draw pictures of young boys.  A.S. also noticed that next to the defendant's bed were albums containing photographs of family members interspersed with ones of young boys wearing white cotton underwear.

4
5
6
7
8
9
10
11

In 1998, A.S. reevaluated his earlier relationship with his father following two incidents.  The first involved defendant's friend Jon Tampico (Tampico), who often came over when A.S. was alone and helped him with his school work.  In July 1998, A.S. watched an episode of America's Most Wanted, which featured Tampico and noted that he was wanted for involvement in child pornography.  A.S. was upset by the fact that defendant condoned him pending time alone with Tampico.  The second incident occurred a week later when Susan asked for a blank disk from defendant's office.  A.S. retrieved an unmarked disk, put it into his mother's computer, and discovered it had files labeled with boys' names.  When A.S. opened one, he saw the back of a little boy with his head turned over his shoulder; the boy's underwear were down, exposing his buttocks. A.S. broke the disk and threw it in the garbage.  He retrieved another blank disk from defendant's office; it was filled with files similarly labeled.  A.S. discarded it without opening the files and reported his discovery to his mother, who became very upset.  A week later, defendant moved out of the house.  Thereafter, A.S. saw defendant return and remove garbage bags of material from the shed.

12
13
14

After the disk discovery, A.S. told his mother about the "rubs" in which defendant had fondled his bare buttocks.  His mother then mentioned a 1985 incident when A.S.'s half-brother found pornography depicting young boys in the shed, and she expressed concern that defendant may have done something to J.W. and C.W.  When A.S. asked if the defendant was a pedophile, Susan said she though he was a child pornographer.

15
16

A.S. first reported the molestations to the police on October 22, 1998.

17

Several males testified regarding defendant's prior uncharged acts of lewd conduct and molestation.

18
19
20
21
22
23
24
25
26

*People v. Smith*, No. H020031, slip op. at 2-5 (Cal. Ct. App. May 1, 2002).  At trial, the prosecution proffered extensive testimony about several other individuals who Smith had allegedly molested as young boys.  The testimony established that since the age of 16, Smith had a pattern of forming relationships with young boys, including Smith's two stepsons, that involved rubbing and spanking their bare buttocks.  The testimony tended to show that Smith derived sexual gratification from these acts.  In addition, Smith sodomized some of the boys, gave them enemas, and inserted objects into their anuses.  While Smith acknowledged that he received sexual gratification from his relationships with some of the boys, he denied that this was true of his relationships with A.S. and his stepsons.

27
28

There was also extensive testimony regarding Smith photographing young boys in various stages of undress and maintaining an extensive collection of child pornography.

3

1
2
3

Defendant also wrote a treatise on pedophilia in which he identifies what he considers to be a positive pedophile, whom he labeled "boy-lover," as one who establishes a loving, rather than exploitive, sexual relationship with a young boy.

4
5
6
7
8
9
10

Homer Resendez testified that, while he was an inmate in Santa Clara jail awaiting trial on a murder case, he once shared a holding cell with defendant.  In response to defendant's questions, Resendez said he was a former gang member and that he was getting out of jail soon.  Defendant asked if Resendez would like to make money by ensuring defendant's wife and child did not come to court as they would give "damaging" testimony; offering $5,000, defendant said he did not care if Resendez killed Susan but he did not want A.S. injured.  Defendant said he was in the printing business and that Resendez would be paid by his business associates.  Defendant discussed details of his case, his personal life, his relationship with his wife, and he made up a poem criticizing government officials from interfering with his lifestyle, which defendant wrote  down and signed.  Resendez said he received no promises or special treatment for testifying, that he did so because he "hate[s] sex cases."

11

.  .  .

12
13
14
15
16

When [Police Detective] Watson interviewed Resendez, Resendez knew information about defendant's case unknown to the public; in addition, Resendez was aware defendant had taken bags of pornographic material to the dump with the help of his son J.W., a fact then unknown to the police.  Resendez was aware defendant had a partner in the publishing business in Tennessee, and Watson confirmed that defendant's brother Beecher lived in Tennessee and was defendant's partner in a publishing business there.

17

.  .  .

18
19
20
21

Defendant conceded he told Resendez the details of his case which Resendez recited in court.  He denied offering Resendez money to keep his wife from testifying, saying he would not have offered money because his assets were frozen in the divorce.  Defendant denied having a publishing partner in Tennessee or saying as much to Resendez but did admit his brother, who lives in Tennessee and has a publishing company, collaborated in editing defendant's books.

22

.  .  .

23

Dr. Randall Weingarten, defendant's psychiatrist, testified for the defense as follows.

24
25
26
27
28

On direct examination, Dr. Weingarten said he had diagnosed defendant as having exhibited pedophilic behavior in adolescence and early adulthood but that, as defendant went through life changes during the late 1970's, he channeled his sexual and erotic pedophilic interests into an "aesthetic aspect" of appreciating young boys.  Dr. Weingarten concluded defendant was able to differentiate any pedophilic thoughts from his parental behavior with his son.  These conclusions were based on Dr. Weingarten's evaluation of defendant's self-reporting of his pedophilic interests.  In particular, Dr. Weingarten mentioned that

United States District Court
For the Northern District of California

4

defendant defendant reported a sexual relationship with a "young man" when defendant was a teenager but had said it did not involve sex, that he had admired the "freshness and vitality" of the youth rather than his sexuality. Dr. Weingarten said defendant reported having undergone religious-type transformation by his early 30's and had come to understand the "sinister" aspects of an interest in young boys. These reports convinced Dr. Weingarten that defendant had matured enough to enter a marital relationship with Susan and put his pedophilia behind him, i.e., that defendant presently views young boys as a source of vitality and beauty in an aesthetic sense rather than in a sexual way.

On cross-examination, Dr. Weingarten acknowledged defendant felt no guilt about his past relationships with boys and thinks about young boys when he masturbates. Through prosecutorial questioning, Dr. Weingarten was confronted for the first time with information presented to the jury about defendant's extensive sexual interest in, and his molestation of, young boys. As a result, Dr. Weingarten reconsidered his opinions and, ultimately, modified or withdrew them.

For example, after learning that defendant had maintained a child pornography collection almost until he was arrested, had made the "slide show" video [of Smith looking at slides of pictures of young boys] in 1981, and had lied when he told Dr. Weingarten he never touched any boys in Big Brothers and only took one potentially inappropriate photograph, Dr. Weingarten testified that, if defendant "misrepresented all those things. . . , it would have made me reconsider his behavior with A.S. and to have very seriously considered the awful notion of incestuous behavior with his own son.

Faced with information regarding defendant's interest in spanking and causing pain and humiliation, his repeated harsh and playful spankings of A.S., and defendant's statements about his sexual fascination with administering spankings, Dr. Weingarten began to "question the motivations that were involved in [defendant's] spanking behaviors" and acknowledged, "I don't really know [if defendant could differentiate between pedophilia and parenting] or not." Learning of the interaction with Sean during which defendant had an erection, Dr. Weingarten conceded defendant's activity with Sean was sexual rather than affectionate or loving, as defendant had claimed and that defendant was unable to maintain a bright line between his pedophilic thoughts and his actions with boys he cared for and mentored.

Dr. Weingarten conceded defendant's behavior in marrying a woman who had two young sons shortly after he was cut off from his source of new boys would correspond to the DAM-IV and the FBI profile for pedophilic behavior but said he found it too "horrifying" a possibility to accept as a motivation.

Hearing the letter written in which a pedophile thanked defendant for sending a story about defendant watching A.S. and his friends skinny dipping, a story which made the friend's "fantasies run amuck," Dr. Weingarten acknowledged this was an instance where defendant "crossed the boundary" between a pedophilic view and a parental view of A.S.

1
2
3
4
5

After hearing the story defendant wrote about his pleasure watching A.S. pull down his pants and swim in white underwear and his pleasure in having A.S. sit in his arms and wrestle with defendant while wearing underwear, Dr. Weingarten agreed defendant "was not capable on all occasions of drawing a bright-line distinction between his pedophilic tenancies and his sexual motivation and his role as a parent of his own child," that "there are possibly moments" when defendant had "sexual motivations" with A.S. and "saw him in a sexual way, and . . . through the eyes of the defendant's pedophilia."

*Smith*, H020031 at 12, 13, 15, 20-22.

## PROCEDURAL HISTORY

On February 3, 1999, a jury found guilty Smith of eleven counts of lewd and lascivious conduct on a child under the age of 14, five counts of lewd and lascivious conduct on a child under the age of 14 by use of force fear, violence, or duress, one count of continual sexual abuse of a child under the age of 14, and one count of possession of child pornography. On April 27, 1999, the trial court sentenced Smith to a term of 68 years in prison. The California Court of Appeal affirmed Smith's conviction on May 1, 2002. The California Supreme Court denied Smith's petition for review on August 14, 2002. On November 10, 2003, he filed a petition for writ of habeas corpus with this Court.

## JURISDICTION AND VENUE

Because Smith claims violations of the Constitution of the United States and has exhausted all remedies available to him in state court, this Court has subject matter jurisdiction. *See* 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 2254(d), petitioner must file his petition within one year and 90 days of the finality of his state court proceedings. 28 U.S.C. § 2254; *Bowen v. Roe*, 188 F.3d 1157, 1158 (9th Cir. 1999). The petition was timely filed as Smith had an appeal to the California Supreme Court pending until August 14, 2002. In addition, because the challenged conviction occurred in Santa Clara County Superior Court, which is located within the judicial district, venue is proper in this Court. *See* 28 U.S.C. § 2241(d); Habeas L.R. 2254-3(a)(1).

## STANDARD OF REVIEW

The court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in

6

**United States District Court**
For the Northern District of California

1    violation of the Constitution or laws  or treaties of the United States."  28 U.S.C. § 2254(a).

2    The petition in this case was filed after the effective date of the Antiterrorism and Effective

3    Death Penalty Act ("AEDPA"), so the provisions of that act apply to it.  Under the AEDPA, a

4    district court may not grant a petition challenging a state conviction or sentence with respect to

5    any claim that was adjudicated on the merits in state court unless the state court's adjudication

6    of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

7    application of, clearly established Federal law, as determined by the Supreme Court of the

8    united States; or (2) resulted in a decision that was based on an unreasonable determination of

9    the facts in light of evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

10        Under the "contrary to" clause, a federal habeas court may grant the writ if the state

11   court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law

12   or if the state court decides a case differently from the Supreme Court on a set of materially

13   indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A state court decision is

14   an "unreasonable application of" Supreme Court authority under the second clause of § 2254(d)

15   if it correctly identifies governing legal principle from the Supreme Court's decisions, but

16   unreasonably applies that principle to the facts of the prisoner's case.  *Id.*  The federal court on

17   habeas review may not issue the writ "simply because that court concludes in its independent

18   judgment that the relevant state court decision applied clearly established federal law

19   erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be granted under the

20   "unreasonable application of" clause only when the court's "independent review of the legal

21   question does not merely allow [the court] ultimately to conclude that the petitioner has the

22   better of the two legal arguments, but rather leaves [the court] with the 'firm conviction' that

23   one answer, the one rejected by the [state] court, was correct and the other, the application of

24   the federal law that the court adopted, was erroneous - in other words that clear error occurred."

25   *Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000).  In deciding whether the state court's

26   decision is contrary to, or an unreasonable application of, clearly established federal law, a

27   federal court looks to the decision of the highest state court to address the merits of a

28   petitioner's claim in a reasoned decision.  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir.

7

1   2000).  If the state court only considered state law, the federal court must determine whether

2   state law, as explained by the state court, is "contrary to" clearly established governing federal

3   law.  *Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001).

4                                                   **DISCUSSION**

5           In his petition, Smith raises four claims of error.  His petition alleges that (1) the State

6   denied him a state-created liberty interest in a jury determination of statute of limitations issues;

7   (2) the jury instructions given under CALJIC 2.50.01 unconstitutionally permitted the jury to

8   convict him solely based upon evidence of prior offenses; (3) this instruction, when combined

9   with California Penal Code § 1108, constitute a violation of the *Ex Post Facto* Clause; and (4)

10  the failure to strike the testimony of a prosecution witness who asserted his Fifth Amendment

11  right against self incrimination as to certain cross-examination questions denied Smith his right

12  under the Sixth Amendment to confront and cross-examine witnesses against him.

13  **A.      Right to Jury Determination of Factual Statute of Limitations Issues**

14          Smith claims first that his convictions were obtained in violation of *Hicks v. Oklahoma*,

15  447 U.S. 343 (1980), denying him due process by deprivation of a state-created liberty interest.

16  Smith contends he was denied a state created-right to a jury determination of whether the statute

17  of limitations had run as to the molestation charges.  The State argues that this Court is

18  precluded from reviewing the merits of Smith's federal claim because the state appellate court

19  decided the issue on state procedural grounds.  Thus, this Court must first resolve whether there

20  is a state procedural bar preventing the Court from reviewing the merits of Smith's claim.

21  Second, if there is no such barrier, the Court must determine whether Smith has been denied a

22  state-created liberty interest in violation of his rights under the Due Process Clause of the

23  Fourteenth Amendment.

24          **1.      Procedural Default**

25          Initially, this Court must determine whether the decision reached by the Court of Appeal

26  bars this Court from reviewing the merits of Smith's claim.  The California Court of Appeal for

27  the Sixth Appellate District held that because "defendant did not raise any dispute as to the

28  factual application of the statute of limitations [at trial], the court had no obligation to give an

**United States District Court**
For the Northern District of California

8

United States District Court

For the Northern District of California

1    instruction to the jury to factually resolve any statute of limitations question." *Smith*, H020031

2    at 30.  The State argues that this holding constitutes a procedural bar that precludes this Court

3    from considering Smith's claim.  Smith counters the State's position with two distinct

4    arguments.  First, he states that the California Supreme Court's blanket denial of his petition for

5    review constituted a review of the merits of his claim and thus the claim is ripe for federal

6    habeas review on the merits.  Second, he argues that the grounds relied on by the appellate court

7    does not constitute an independent and adequate state procedural bar as required to prevent

8    federal habeas review on the merits.  The Court reviews each argument in turn.

9                    **a.    California Supreme Court's Blanket Denial of Petition**

10          Smith's first argues that because the state supreme court, in issuing a one-line summary

11   denial of his petition for review from the Court of Appeal, did not cite procedural default as the

12   reason for the denial, the denial constitutes a decision on the merits of all issues contained in his

13   petition.  If the California Supreme Court's decision was in fact based upon the merits of

14   Smith's claim, it would remove any procedural bar levied by the Court of Appeal.

15                              **i.    Legal Standard**

16          The United States Supreme Court has held that where the last reasoned state court

17   opinion on a claim imposes a procedural bar, federal courts on habeas review should presume

18   that a later decision by a higher state court, rejecting the claim without discussion, did not

19   silently disregard the bar and consider the merits.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-

20   806 (1991); *see also McQuown v. McCartney*, 795 F.2d 807, 809-810 (9th Cir. 1986) (holding

21   that where petitioner's claim was dismissed by the California Court of Appeal on procedural

22   grounds, the California Supreme Court's summary dismissal of the claim was not a decision on

23   the merits).

24                              **ii.    Analysis**

25          Smith claims that compelling authority supports his contention that the California

26   Supreme Court's blanket denial constitutes a decision on the merits of his federal claim.  *See*

27   *e.g. Green v.  Lambert*, 288 F.3d 1081, 1087 (9th Cir. 2002) ("[A] bare postcard denial from the

28

                                              9

1   California Supreme Court [is] a decision on the merits, for purposes of the exhaustion

2   requirement, unless that court expressly relied on a procedural default.").

3          The authorities cited by Smith for this premise, however, involve situations in which the

4   state supreme court did not have before it a reasoned decision of a lower appellate court. These

5   authorities are thus distinct from *Ylst* and *McQuown*, as well as Smith's case, in which a state

6   supreme court is affirming a *reasoned* decision by a lower appellate court. Thus, because the

7   California Court of Appeal issued a reasoned decision, *Ylst* and *McQuown* are controlling.

8   Therefore, the California Supreme Court's summary denial of Smith's petition for review does

9   not constitute a decision on the merits of his claim, but rather an affirmation of the lower court's

10  finding that the claim is barred by state procedural default.

11                    **b.      Independent and Adequate State Grounds**

12         Next, Smith argues that the procedural grounds on which the state court rested its

13  opinion do not constitute an independent and adequate state procedural bar necessary to restrict

14  federal habeas review on the merits.

15                              **i.      Legal Standard**

16         A federal court will not review questions of federal law decided by a state court if the

17  decision also rests on a state law ground that is independent of the federal question and

18  adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). There

19  are two grounds on which a state procedural rule may fail to be "adequate" to preclude review

20  by federal courts. First, if a state procedural rule frustrates the exercise of a federal right, the

21  rule is inadequate to preclude federal court review. Second, to be "adequate," the state

22  procedural bar cited must be "clear, consistently applied, and well-established at the time of the

23  petitioner's purported default." *Calderon v. United States Dist. Court (Bean)*, 96 F.3d 1126,

24  1129 (9th Cir. 1996). Federal courts examining whether a state procedural bar is clear and

25  consistently applied may not consider cases decided after the petitioner would have had to raise

26  an issue or objection. *Morales v. Calderon*, 85 F.3d 1387, 1391-93 (9th Cir. 1996).

27         The Ninth Circuit has established the following burden-shifting analysis in assessing the

28  adequacy of a state procedural bar:

United States District Court

For the Northern District of California

> [T]he ultimate burden of proving the adequacy of the California state bar
> is upon the State of California. . . .  Once the state has adequately pled the
> existence of an independent and adequate state procedural ground as an
> affirmative defense, the burden to place that defense in issue shifts to the
> petitioner.  The petitioner may satisfy this burden by asserting specific
> factual allegations that demonstrate the inadequacy of the state procedure,
> including citation to authority demonstrating inconsistent application of
> the rule.  Once having done so, however, the ultimate burden is the state's.

*Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003).  Procedural default is an affirmative defense.  *Id.* at 586.

### ii.    Analysis

Smith argues that the procedural bar relied on by the state court was not "adequate" because it was not "clear, consistently applied, and well-established at the time of the petitioner's purported default."  *See Calderon*, 96 F.3d at 1129.  The Court analyzes this argument in light of the burden-shifting framework established in *Bennett*.

The State has pled the existence of an adequate an independent state procedural bar, and thus the burden shifts to Smith.  Smith contends that two California cases, *People v. Gordon*, 165 Cal.App.3d 839 (1985), and *People v. Angel*, 70 Cal.App.4th 1141 (1999), stand for the proposition that failure to raise the statute of limitations issue at trial does not effect a forfeiture of the right to a factual determination of statute of limitations issues by the jury.  Smith claims that both of these cases reveal that "failure to instruct on the statute of limitations even absent a request to do so has consistently led California courts to reverse a resulting conviction." (Petitioner's Traverse at 7.)  Indeed, neither of the two decisions cited by Smith indicate that the respective defendants requested jury instructions on statute of limitations issues, and in both the California Courts of Appeal reversed the convictions of sex offenders whose convictions could potentially have been for acts occurring within or outside the statute of limitations.  *See Gordon*, 165 Cal.App.3d at 852; *Angel*, 70 Cal.App.4th at 1145.

These two cases put at issue whether it would be consistent for an appellate court to make its own determination on the statute of limitations question based upon a review of the record.  Thus, Smith has presented an inconsistency argument sufficient to shift the burden back to the State.

United States District Court

For the Northern District of California

Indeed, the ultimate burden lies with the State. *See Bennett*, 322 F.3d at 585. The State has not cited any case in which an appellate court found that it could determine from the record whether the jury had convicted a defendant for a crime within the limitations period, nor has the State sufficiently refuted Smith's inconsistency arguments. The State relies primarily on *People v. Williams*, 21 Cal.4th 335 (1999), for the proposition that California appellate courts can make factual statute of limitations decisions. *Williams*, however, was not decided until six months after the jury had convicted Smith. Therefore, under *Morales*, the *Williams* case cannot be considered in determining whether the state procedural bar is adequate. *Morales*, 85 F.3d at 1391-93 (federal courts may not consider cases decided after the petitioner would have had to raise an issue). Because Smith has met his burden and the State has not, the Court finds that the state procedural bar in the present case was not adequate to prevent the Court from considering the federal constitutional issue in question. Thus, the Court will examine the merits of Smith's claim that his right to due process of law was violated.

**2.      Due Process Right to State-Created Liberty Interest**

The Court must next consider whether Smith was denied a state-created liberty interest. According to the California Court of Appeal:

> A complaint was filed against [Smith] on October 26, 1998 charging him with a single violation of continuous sexual abuse of a child under age 14 between April 1, 1989 and April 30, 1996 (§ 288.5, subd. (a)), and an arrest warrant issued on that date, which fixed the date of commencement of the prosecution as well as the ending date of the statute of limitations. (§ 804.) After a preliminary hearing, defendant was bound over to superior court for trial. On November 23, 1998, an information was filed which charged the defendant with the 18 counts listed [above]. It charged that count 1 occurred between April 22, 1989 and April 21, 1990, count 2 between April 22, 1990 and April 21, 1991, and counts 3 through 17 between April 22, 1991 and April 21, 1996.

*Smith*, H020031 at 22-23. Charges 1 through 17 are each punishable by a maximum penalty of at least eight years in prison. These charges are governed by California Penal Code § 800, providing that "prosecution for an offense punishable by imprisonment in the state prison for eight years or more shall be commenced within six years after the commission of the offense."

In a pre-trial motion, Smith asked the trial court to dismiss the first two counts on the grounds that they were facially barred by the statute of limitations. The trial court found,

12

United States District Court

For the Northern District of California

1   however, that an exception applied under California Penal Code § 803(f), which provides that

2   "a criminal complaint may be filed within one year of the date of a report to a responsible adult

3   or agency by a child under 18 years of age that the child is a victim of a crime described in

4   Section . . . 288 . . .[or] . . . 288.5 . . . . [¶] . . . This subdivision applies only if both of the

5   following occur: [¶] (A) The limitation period specified in Section 800 or 801 has expired. [¶]

6   (B) The defendant has committed at least one violation of Section 288 . . . [or] 288.5 . . . against

7   the same victim within the limitation period specified for that crime in either Section 800 or

8   801." *Smith*, H020031 at 23-24.  Smith did not make any further statute of limitations

9   challenges during the trial.  When the case went to the jury, the trial court did not provide the

10  jury with any instructions regarding the statute of limitations.  On appeal, Smith for the first

11  time claimed that statute of limitations barred each of his offenses because the jury could have

12  convicted him for crimes occurring more than six years prior to the proceedings.  The Court of

13  Appeal held that Smith's claim was without merit because § 803(f)'s tolling provision applied.

14      California law requires that the prosecution show by a preponderance of the evidence

15  that the action against a criminal defendant was commenced within the statute of limitations.

16  The jury is responsible for making factual determinations related to statute of limitations

17  questions.  *People v. Zamora*, 18 Cal.3d 538, 547 (1976).  Smith asserts that California has

18  created a liberty interest in a jury trial as to factual statute of limitations determinations, and that

19  under *Hicks v. Oklahoma*, 447 U.S. 343 (1980), it was a violation the Due Process Clause of the

20  Fourteenth Amendment for the Court of Appeal to make the determination on its own.

21          **a.    Legal Standard**

22      "Where a state has provided for the imposition of criminal punishment in the discretion

23  of the trial jury, . . . [a] defendant has a substantial and legitimate expectation that he will be

24  deprived of his liberty only to the extent determined by the jury in the exercise of its statutory

25  discretion, and that liberty interest is one that the Fourteenth Amendment preserves against

26  arbitrary deprivation by the state." *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *see also*

27  *Bonin v. Calderon*, 59 F.3d 815, 841 (9th Cir. 1995) (violation of state law raises federal

28  constitutional concerns when a state law creates a protected "liberty interest").  A state law

creates a "liberty interest" protected by the Due Process Clause if the law: (1) contains "substantive predicates" governing official decision making, and (2) contains "explicitly mandatory language" specifying the outcome that must be reached if the substantive predicates are met." *Bonin*, 59 F.3d at 842.  "In order to contain the requisite 'substantive predicates,' the state law at issue 'must provide more than merely procedure; it must protect some substantive end." *Id*. (quoting *Dix v. County of Shasta*, 963 F.2d 1296 (9th Cir. 1992)).  If the State permits its appellate courts to cure the deprivation and the deprivation is cured, the state-created right cannot form the basis of a liberty interest.  *Arreguin v. Prunty*, 208 F.3d 835, 837 (9th Cir. 2000).  Such a liberty interest is, at most, a qualified liberty interest that does not raise due process concerns.  *Id.*

A determination of state law by a state appellate court is binding in a federal habeas action.  *Hicks v. Feiock*, 485 U.S. 624, 629 (1988).  Even a determination of state law made by an intermediate appellate court must be followed and may not be "disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id*. at 630 n.3 (quoting *West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 237-38 (1940)).

### b.    Analysis

This Court need not address the question of whether the right to a jury determination of statute of limitations issues is a constitutionally protected liberty interest.  Even assuming *arguendo* that the right to such a determination is a liberty interest, the California Court of Appeal found in Smith's case that the California Supreme Court qualified that right by allowing appellate courts to cure any deprivation.  *See Smith*, H020031 at 31; *see also Williams*, 21 Cal.4th at 341 (requiring appellate courts to remand for a hearing only if they cannot determine based on the record whether an offense is time-barred).  Therefore, unless this Court is convinced that the California Supreme Court would have decided the issue differently, the interpretation of state law by the Court of Appeal is controlling.

This Court is not convinced that the California Supreme Court would have decided the matter differently.  Smith again cites to *Gordon*, 165 Cal.App.3d 839, and *Angel*, 70

14

1    Cal.App.4th 1141, as examples of the state created liberty interest he alleges.  To the extent that

2    these cases are offered to prove that the California Supreme Court would have held that the

3    Court of Appeal may not make a determination as to whether the limitations period had run on

4    its own, they are unpersuasive.

5    　　　The court in *Gordon* held that "[s]ince it is impossible to determine whether the jury

6    convicted defendant of an offense not shown to have been committed within the period of

7    limitations, the conviction is fatally flawed."  *Gordon*, 165 Cal.App.3d at 852.  It is unclear,

8    however, whether the *Gordon* court believed it did not have the power to make this

9    determination without sending the case back to a jury under any circumstances, or whether it

10   would have empowered itself to make this determination had the record not made it

11   "impossible" to assess whether the jury had convicted the defendant of an offense allowable

12   under the statute.  Similarly, the *Angel* court stated that "[s]ince we cannot tell whether the jury

13   convicted appellant of offenses not shown to have been committed within the period of

14   limitations, the convictions are fatally defective unless the statute of limitations was tolled."

15   *Angel*, 70 Cal.App.4th at 1145.

16   　　　Thus, the appellate court in each of the cases found that it did not have enough

17   information with which to determine whether the limitations period had expired.  Therefore,

18   neither court addressed the issue of whether appellate courts had the power to rule on statute of

19   limitations questions when the record provides sufficient information with which to do so.

20   Further, the *Angel* court's statement the convictions would be "fatally defective unless the

21   statute of limitations was tolled" indicates that had it found that a particular tolling provision

22   applied, the court would have upheld the conviction.  *Angel*, 70 Cal.App.4th at 1145.  Indeed,

23   the court examined the tolling statute the State argued was applicable in that case and

24   determined that it did not apply.  *Id.*

25   　　　Further, the California Supreme Court's opinion in *Williams* indicated that California

26   appellate courts have the power to determine whether or not the limitations period in criminal

27   cases has run.  *Williams*, 21 Cal.4th at 341.  First, the court in *Williams* held that criminal

28   defendants can raise the statute of limitations for the first time on appeal.  *Id.*  Judicial economy

1   is best served if appellate courts are then empowered to review the merits of such claims when

2   the record makes such review possible.  Allowing appellate courts to consider the merits of

3   statute of limitations claims when the record presents sufficient evidence to make an accurate

4   determination is consistent with *Williams*'s holding that defendants may raise statute of

5   limitations issues for the first time on appeal.

6          Second, *Williams* states that "[a]lthough . . . a defendant may not forfeit the statute of

7   limitations if it has expired as a matter of law, they may certainly lose the ability to litigate

8   factual issues such as questions of tolling." *Id.*  The *Williams* court cited with approval to a

9   California Court of Appeal case, which held that appellate courts need not send statute of

10  limitations questions back to lower courts if it is able, based upon the record, to cure any error

11  as a matter of law.  *Id.* at 345.  The fact that the *Williams* court did so supports the Court of

12  Appeal's decision to make a legal determination based upon the factual record before it.  In

13  sum, this Court is unconvinced that the California Supreme Court would have come to a

14  different conclusion than the Court of Appeal.

15         Therefore, this Court is bound by the Court of Appeal's interpretation of California law.

16  Under its interpretation, the right in California to a jury determination of statute of limitations

17  questions is, at best, a qualified liberty interest, which is unprotected by the Due Process

18  Clause. Indeed, this case closely resembles *Arreguin*, in which the Ninth Circuit held that the

19  state appellate court's harmless error review sufficiently cured any deprivation of a state-created

20  right, making the right a qualified liberty interest.  *Arreguin*, 208 F.3d at 837.  In the present

21  case, the Court of Appeal found that even assuming that it was error not to instruct the jury as to

22  the statute of limitations, this error was harmless.  *Smith*, H020031 at 32.  The court found that

23  the convictions fell within the statute of limitations based on California Penal Code § 803(f):

> [Smith] did not dispute at trial that the identified acts occurred
> regularly over the course of the period charged in counts 3 through
> 17, including the period between October 26, 1992 and April 20,
> 1996, which fell within the section 800 statute of limitations.  His
> only defense was that he lacked the requisite lewd intent when he
> committed those acts. Here, where the evidence of the required intent
> was overwhelming as was the evidence that the defendant committed
> all of the hundreds of acts occurring both outside and within the six-

United States District Court
For the Northern District of California

1    year limitations period, any error is harmless beyond a reasonable
2    doubt.

3    *Id.* The Court of Appeal's harmless error review was "sufficient to satisfy the standard for

4    state-created qualified liberty interests." *See Arreguin*, 208 F.3d at 837.   Thus, Smith's claim

5    for habeas relief on this ground is denied.

6    **B.    CALJIC No. 2.50.01**

7         Next, Smith claims that the jury instructions allowed a conviction on the charged

8    offenses based solely on a finding that he had committed uncharged offenses.  He claims that

9    the instructions violated his right under the Fifth, Sixth, and Fourteenth Amendments.

10        The trial court instructed the jury with CALJIC No. 2.50.01 as follows:

11        Evidence had been introduced for the purpose of showing that the
          defendant engaged in a sexual offense on one or more occasions other
12        than that charged in the case. . . .

13        If you find that the defendant committed a prior sexual offense, you may,
          but are not required to, infer that the defendant had a disposition to
14        commit the same or similar types of offenses.  If you find that the
          defendant had this disposition, *you may, but are not required to, infer that*
15        *he was likely to commit and did commit the crime or crimes for which he*
          *is accused*.

16
          However, if you find *by a preponderance of the evidence* that the
17        defendant committed a prior sexual offense, that is not sufficient by itself
          to prove beyond a reasonable doubt that he committed the charged crimes.
18        . . . You must not consider this evidence for any purpose unless you find
          by a preponderance of the evidence that the defendant committed the other
19        crimes.

20        Smith contends that the instruction created a permissive inference, allowing the jury to

21   convict him based on his prior offenses alone should it have found beyond a reasonable doubt

22   that the prior offenses took place.

23        **1.    Legal Standard**

24        In analyzing whether an instruction that creates an evidentiary inference violates due

25   process by relieving the State of its burden of proving each element of a crime beyond a

26   reasonable doubt, the Court must first determine whether the instruction creates a mandatory

27   presumption or a permissive inference.  *United States v. Warren*, 25 F.3d 890, 897 (9th Cir.

28

*United States District Court*
For the Northern District of California

17

1994). "[A] permissive inference instruction allows, but does not require, a jury to infer a specified conclusion if the government proves certain predicate facts." *Id.*

An instruction that merely creates a permissive inference violates due process unless it can be said "'with substantial assurance'" that the inferred fact is "'more likely than not to flow from the proved fact on which it is made to depend.'" *County Court of Ulster County v. Allen*, 442 U.S. 140, 167, n.28 (1979) (quoting *Leary v. United States*, 395 U.S. 6, 36 (1969)). Courts "determine the constitutionality of a permissive inference instruction on a case-by-case basis" by reviewing the record evidence to see if the court can say with substantial assurance that the inferred fact flows more probably than not from the facts proven in the particular case. *Warren*, 25 F.3d at 898.

The United States Supreme Court has held that even if a jury instruction violated the petitioner's constitutional rights, the petitioner can only obtain relief if the unconstitutional inference instruction resulted in actual prejudice under *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). Actual prejudice exists if the unconstitutional instruction had a "substantial influence on the conviction." *Patterson v. Gomez*, 223 F.3d. 959, 967-68 (9th Cir. 2000); *Hanna v. Riveland*, 87 F.3d 1034, 1039 (9th Cir. 1996)

### 2.    Analysis

In examining this claim, the California Court of Appeal applied a state law standard and rejected Smith's "interpretation, which requires the jury to view the instruction as setting out two competing, contradictory standards regarding propensity evidence." *Smith*, H020031 at 36. The Court did not look to any federal law regarding the acceptability of permissive inferences.

This Court, however, need not reach the issue of whether the Court of Appeal's decision was a reasonable application of clearly established federal law. The Court of Appeal subsequently held that, even assuming *arguendo* that error occurred, the error was harmless beyond a reasonable doubt. Analysis of this holding proves dispositive of Smith's claim.

As the Court of Appeal noted, the only matter at issue in Smith's case was whether his intent in touching his son was sexual, and that the record was rich with evidence that Smith had such intent, including "downloading explicit sexual fantasies about fathers spanking their sons,"

18

United States District Court

For the Northern District of California

1   until the night he was arrested.  Given the substantial evidence supporting Smith's sexual intent

2   aside from the evidence of his prior alleged sexual offenses, there is no possibility that the jury

3   convicted him solely based upon evidence of the prior offenses.  Hence, the Court of Appeal's

4   determination that any error was harmless beyond a reasonable doubt was not contrary to or an

5   unreasonable application of clearly established federal law.  If Smith can not prevail under

6   harmless error review, he certainly cannot establish actual prejudice.  His claim for habeas relief

7   on this ground is therefore denied.

8   **C.      Section 1108 and CALJIC 2.50.01 *Ex Post Facto* Clause Violation**

9           Based upon the same construction of CAJIC 2.50.01 he urged in his previous claim,

10  Smith contends that in combination with California Evidence Code § 1108, the jury instructions

11  violated the *Ex Post Facto* Clause.  Smith argues that a statute permitting the use of a form of

12  evidence that was inadmissible at the time of the commission of the offense, when combined

13  with an instruction that deems such evidence sufficient to support a conviction, violates the *Ex*

14  *Post Facto* Clause.

15          **1.      Legal Standard**

16          A law has an impermissible *ex post facto* effect if it alters the legal rules of evidence,

17  and less or different testimony is needed to convict the offender than the law required at the

18  time of the commission of the offense.  *Carmel v. Texas*, 529 U.S. 513, 530 (2000).

19          **2.      Analysis**

20          The California Court of Appeal held that because "defendant's underlying premise

21  regarding CALJIC No. 2.50.01 is flawed . . . that premise cannot support his *ex post facto*

22  claim."  *Smith*, H020031 at 38.  Indeed, this Court has already deemed reasonable the Court of

23  Appeal's determination that the jury in Smith's case would not have convicted him based upon

24  the evidence of his prior offenses alone.  Thus, CALJIC did not alter the quantum of proof

25  necessary to obtain his conviction.  Therefore, the Court of Appeal's determination that the jury

26  instructions did not violate Smith's rights under the *Ex Post Facto* Clause was neither contrary

27  to, nor an unreasonable application of clearly established federal law.

28

**United States District Court**
For the Northern District of California

**D.      Testimony by Smith's Cellmate**

Smith next contends that his Sixth Amendment right to confront witnesses against him was violated by the trial court's refusal to strike the testimony of Homer Resendez, who shared a cell with Smith during his trial.  Resendez testified that Smith had offered to pay him to prevent Smith's wife and son from testifying at trial.

Already in prison for other crimes, Resendez was awaiting trial on murder charges in a 1980 killing for which he and several other defendants had been indicted.  He testified to this fact at trial. (Reporter's Transcript ("RT") 937.)  He further testified, however, that he had not been offered any deal for leniency in exchange for his testimony and, in fact, had been expressly told that he would not receive any consideration in his murder case.  *Id.*  Resendez stated that his incentive for testifying was his distaste for child molesters.  (RT 932-34.)  When asked about events occurring on the date of the murder, however, Resendez asserted his Fifth Amendment right against self-incrimination.  The trial court denied Smith's motion to strike Resendez's testimony based on his assertion of his Fifth Amendment Privilege.  Smith claims that the trial court erred in denying this motion.

Smith further contends, based on evidence not admitted at trial, that the prosecution failed to disclose a deal that they had made with Resendez, offering him leniency as to the murder charges against him in exchange for his testimony.

**1.      Legal Standard**

When a witness invokes his Fifth Amendment privilege on cross-examination, his testimony may be stricken in whole or in part "if invocation of the privilege blocks inquiry into matters which are 'direct' and are not merely 'collateral.'"  *United States v. Seifert*, 648 F.2d 557 (9th Cir. 1980).  The trial court may not completely foreclose questioning into areas of potential bias, but may impose reasonable limits on such questioning "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  A court has "[n]o obligation . . . to protect a witness from being discredited on cross examination, short of an attempted invasion of his constitutional protection from self

20

incrimination." *Davis v. Alaska*, 415 U.S. 308, 320 (1974).  The *Davis* Court's recognition of

the need to protect witnesses from such invasions "clearly mandates that a court balance the

witness' fifth amendment privilege on one hand against the defendant's sixth amendment right

to cross-examination on the other." *Ellis v. Black*, 732 F.2d 650 (8th Cir. 1983).  *See also*

*United States v. Nunez*, 668 F.2d 1116, 1123 (10th Cir. 1981) (also balancing a witnesses Fifth

Amendment privilege against a criminal defendant's Sixth Amendment right to confrontation

and cross-examination).

### 2.    Motion to Strike

The California Court of Appeal held that the trial court properly denied Smith's motion

to strike Rezendez's testimony.  The Court of Appeal found that the trial court had set

reasonable limits on Smith's inquiry into the 1980 homicide and determined that Smith was

able to secure answers to the majority of the questions for which Resendez invoked his privilege

against self incrimination and further, that Smith was not entitled to those answers that he did

not receive.  *Smith*, H020031 at 63.  The Court of Appeal noted the trial court's finding that the

defense was able to attack Resendez's credibility, thus diminishing the need to query him

further.

In essence, the Court of Appeal found that the trial court had properly balanced the

witness' right not to incriminate himself against the defendant's right to confront witnesses

against him.  In light of *Ellis* and *Nunez*, this Court cannot say that this balancing was contrary

to or an unreasonable application of the Supreme Court's holdings in *Davis* and *Van Arsdale*.

Thus, Smith's claim for habeas relief on this ground is denied.

### 3.    Secret Deal With Resendez

The California Court of Appeal found that Smith's claim that "the prosecution failed to

disclose a secret deal for leniency [with Resendez] lacks support in the record."  *Smith*,

H020031 at 57.  The Court of Appeal mentioned the evidence Smith offered to prove this claim

on appeal, although it is unclear how much, if any, weight was given to it.  New evidence, not

**United States District Court**
For the Northern District of California

1  offered at trial, may not properly be considered by California appellate courts on direct appeal.

2  *People v. Ihm*, 247 Cal.App. 2d 388, 393 (1966).[1]

3     Even assuming *arguendo* that the Court of Appeal fully considered the new evidence, its

4  determination that the evidence failed to establish that Resendez and the State entered into a

5  secret deal was reasonable.  As the Court of Appeal noted, Resendez had been in prison for

6  seven years at the time of Smith's trial, thus the fact that he received credit for time served is

7  not necessarily indicative of any deal.  Further, none of the facts offered by Smith, even if fully

8  accepted, prove that Resendez's participation in the murder rose above that of an accessory

9  after the fact.  Thus, the Court of Appeal's decision did not result "in a decision that was based

10  on an unreasonable determination of the facts in light of the evidence presented in the State

11  court proceeding."  28 U.S.C. § 2254(d).

**CONCLUSION**

12     For the reasons set forth, the petition for a writ of habeas corpus is DENIED.

14  **IT IS SO ORDERED.**

16  Dated:  May 9, 2005                    ___/s/ Jeffrey S. White___

17                                        JEFFREY S. WHITE
                                          UNITED STATES DISTRICT JUDGE

---

26  [1] Smith would have had the right to present his new evidence in state habeas corpus proceedings.  Because Smith never sought state habeas relief, as was his right, if the Court of
27  Appeal did not consider the evidence, any claim brought based on it would appear to be procedurally barred regardless, due to failure to exhaust all potential state law remedies.  *See*
28  28 U.S.C. § 2254(b), (c).

United States District Court
For the Northern District of California